**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **YOLANDA WOOD, Administratrix of THE ESTATE OF AARON LEE SIMPSON, JR.** | : | |
| | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| | : | |
| **v.** | : | **No. 18-1886** |
| | : | |
| **NATIONAL RAILROAD PASSENGER CORPORATION, A/K/A AMTRAK** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**Goldberg, J.**                                                                 **August 21, 2020**


**<u>MEMORANDUM OPINION</u>**

      Plaintiff, Yolanda Wood, filed this negligence, wrongful death, and survival action against Defendant, National Railroad Passenger Corporation, also known as Amtrak, after her thirteen-year-old son was tragically struck and killed by Defendant's train.  Defendant seeks summary judgment on all claims in the Complaint as well as the exclusion of the testimony of Plaintiff's expert, Richard Beall, pursuant to <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).

      For the reasons set forth below, I will grant Defendant's Motion for Summary Judgment regarding Plaintiff's claims of negligence, excessive speed, failure to train, failure to erect fencing along the right-of-way, and punitive damages.  I will deny Defendant's Motion for Summary Judgment regarding the issue of wanton conduct.  Defendant's motion to exclude the testimony of Mr. Beall will be denied without prejudice.

# I.   FACTUAL AND PROCEDURAL HISTORY

## A.   Statement of Facts[1]

On December 14, 2016, shortly before 4:35 p.m., thirteen-year-old Aaron Simpson ("Simpson") was walking from his home to the nearby youth center for an after-school program.[2] On route, Simpson entered Defendant Amtrak's right-of-way near the Parkesburg, Pennsylvania train station and began walking on Defendant's tracks.[3]

Simpson and his parents had lived in Parkesburg since June 2016.[4] Starting about a month after his family moved to the area until the time of his death, Simpson regularly attended programs at the youth center.[5] Simpson was usually driven to the youth center by his father,[6] but, as a result of a promotion at work in November 2016, Simpson's father was unable to drive Simpson to the after-school program.[7] Both Simpson's father and Plaintiff, Yolanda Wood, Simpson's mother, warned Simpson to be careful because there were train tracks in the area.[8] In fact, train horns could be heard from Simpson's home.[9] Plaintiff claims that Simpson was walking on Defendant's tracks for at least 195 feet before the accident.[10]

At the same time that Simpson was walking on the tracks, Amtrak Keystone Service Train No. 647 was travelling westbound toward Simpson.[11] The train was operated by Scott Wilson ("Engineer Wilson").[12] As the train approached the area of the tracks where Simpson was walking, Engineer Wilson slowed the train because of a temporary speed restriction of 60 miles per hour, internally created by Defendant (the "Amtrak Slow Order").[13] Without the Amtrak Slow Order, the speed limit for that same stretch of track is 90 miles per hour, as mandated by the Federal Railroad Administration ("FRA").[14]

Plaintiff's expert, James Loumiet, opines that the actual line of sight from the point of impact with Simpson to the engineer's cabin was 4,200 feet, which would have made Simpson

visible to the engineer for approximately 45.4 seconds prior to the accident.[15]   As the train approached Simpson, it entered a slight curve.  Loumiet concludes that, after coming out of that curve, Engineer Wilson had a straight line of sight for approximately 2,438 feet, approximately 26.6 seconds prior to the accident.[16]  It is undisputed that Engineer Wilson first saw Simpson on the tracks, with his back to the train, walking away from the train, from a distance of about 1,312 feet or 13.6 seconds before the point of impact.[17]

When Engineer Wilson saw Simpson, he began blowing the train's horn.[18]  The train's horn also activated a bell, and the lights on the front of the train started flashing.[19]  At the time the horn was blown, the train was traveling at 61 miles per hour.[20]  It is undisputed that the train continued to accelerate until about 6.6 seconds before impact,[21] reaching a maximum speed of 67 miles per hour at this time.[22]

After seeing Simpson on the tracks, Engineer Wilson decreased the throttle from T8 to T6,[23] but then increased the throttle from T6 to T7.[24]  While the parties agree that the adjustments to the throttle were made manually by Engineer Wilson,[25] they dispute why the throttle increased to T7.  Plaintiff asserts that Wilson intentionally increased the throttle, and Defendant claims the throttle "settled" at T7.[26]  According to Plaintiff's expert Loumiet, these throttle adjustments occurred 10.6 to 11.6 seconds before impact.[27]

It is undisputed that, two seconds later, Engineer Wilson moved the throttle to the idle position.[28]  Plaintiff's expert Loumiet concludes that this last throttle adjustment occurred 8.6 to 9.6 seconds before impact.[29]

As the train continued to approach, with its horn blowing, Simpson was walking with his back to the train on the same track that the train was traveling—on the south side of the track, just outside of the rails.[30]  Plaintiff alleges that Engineer Wilson continuously blew the horn for 11.3

seconds without any reaction from Simpson.[31]  It is undisputed that Simpson was on a FaceTime video chat with friends for approximately 10 minutes, immediately preceding the accident.[32]

The parties agree that Engineer Wilson applied the train's service brake 3.6 to 4.6 seconds before impact[33] and that, when Engineer Wilson finally applied the brakes, he only engaged the service brake and not the emergency brake.[34]  When asked why he did not immediately brake upon seeing Simpson on the tracks, Engineer Wilson testified that he wanted to give Simpson "a chance to react and get off the tracks."[35]  And when asked why he applied the service brake and not the emergency brake, Wilson testified, "I don't know."[36]

Seconds before impact,[37] Simpson ran from the south side rail (the left side of the track as the train approached), directly in front of the train, to the north side rail (right side).[38]  As will be discussed below, Defendant claims that this was when Simpson was in peril.  According to Defendant, this was the point at which Engineer Wilson's duty to attempt to avoid the collision was triggered.  Simpson continued to run along the north side of the track, but a trestle guardrail blocked further escape,[39] and he was struck by the train.[40]  The train was traveling 64 to 65 miles per hour when it hit Simpson.[41]  Plaintiff's expert, Loumiet, concludes that if Wilson had applied the service brake sooner, at least 3 seconds after he sounded the horn, it would have taken the train an additional 4.6 seconds to reach the point of impact, and Simpson could have avoided the trestle and would not have been hit.[42]  Loumiet also concludes that had Wilson applied the emergency brakes 3 seconds after he first sounded the horn, it would have taken the train an additional 7 seconds to reach the point of impact, and, again, the trestle could have been avoided and impact would not have occurred.[43]

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

4

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).

A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party. Id. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001).

The moving party bears the initial burden of informing the court of its basis for seeking summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must point to portions of the record that it believes show the absence of a genuine issue of material fact. Id. If the movant meets its burden, the burden then shifts to the nonmovant to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. Unsubstantiated arguments made in briefs are not considered evidence of asserted facts. Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

III.    <u>ANALYSIS</u>

In resolving Defendant's Motion for Summary Judgment, which involves examination of Plaintiff's negligence, wrongful death, and survival actions, the following issues must be examined: (1) what duty of care did Defendant owe to Simpson; (2) whether Defendant breached its duty of care by acting wantonly; (3) whether Simpson's own negligence and wanton conduct bars Plaintiff's recovery; (4) whether Plaintiff's claims based on the train's speed are preempted by the Federal Railroad Safety Act ("FRSA"); and (5) whether Plaintiff's claim for punitive damages can survive summary judgment.[44]  I address each of these issues in turn below.

A.    <u>Defendant's Duty of Care Owed to Simpson</u>

Defendant first argues that Plaintiff's negligence claim is barred because Simpson was a trespasser under Pennsylvania's railroad civil immunity statute and, therefore, Plaintiff may only pursue a claim of wanton or willful conduct.   Pennsylvania's railroad civil immunity statute provides that:

> [(a)] A railroad carrier owes no duty of care to keep its railroad property safe for entry or use by any trespasser who enters upon any railroad property or railroad right-of-way or to give any warning to such trespasser entering or going on that railroad property of a dangerous condition, use or activity thereon. Except as set forth in subsection (b), a railroad carrier shall not:
>
>> (1) Be presumed to extend any assurance to a trespasser entering or going on railroad property without the railroad carrier's consent that the railroad property is safe for any purpose.
>>
>> (2) Incur any duty of care toward a trespasser entering or going on railroad property without the railroad carrier's consent.
>>
>> (3) Become liable for any injury to a trespasser entering or going on railroad property without the railroad carrier's consent caused by an act or omission of such trespasser.
>
> [(b)] Nothing in this section limits in any way any liability which otherwise exists for willful or wanton failure to guard or warn against a dangerous condition, use or activity.

[(c)] As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

"Trespasser." A person who enters onto railroad property without any right, lawful authority or the express consent of the railroad. . . .

42 Pa. Cons. Stat. § 8339.1(a)–(c).

While the determination of whether a person is a trespasser is typically one of fact for the jury, "[w]here the evidence is insufficient to support an issue, however, it may be appropriate for the court to remove that issue from the jury." Palange v. Phila. Law Dep't., 640 A.2d 1305, 1307 (Pa. Super. Ct. 1994). A "trespasser" pursuant to Pennsylvania's railroad civil immunity statute is a person "who enters onto railroad property without any right, lawful authority or the express consent of the railroad." 42 Pa. Cons. Stat. § 8339.1(c). The United States Court of Appeals for the Third Circuit, in applying Pennsylvania law, has held that "[m]ere acquiescence to trespassing does not alter an entrant's status," and that "a foreseeable trespasser is still a trespasser." Estate of Zimmerman v. Se. Pa. Transp. Auth., 168 F.3d 680, 686 (3d Cir. 1999); see also Manfred v. Nat'l R.R. Passenger Corp., 106 F. Supp. 3d 678, 682 (W.D. Pa. 2015).

If the court deems a person a trespasser, then the trespasser may only recover for injuries sustained on the possessor's land "if the possessor of [the] land was guilty of wanton or willful negligence or misconduct." Rossino v. Kovacs, 718 A.2d 755, 756 (Pa. 1998); see also 42 Pa. Cons. Stat. § 8339.1(b).

It is undisputed that, at the time of the accident, Defendant owned the tracks at issue.[45] And Plaintiff admits that Simpson was a trespasser. (Oral Argument Tr. at 8:2–20.) Indeed, no evidence of record suggests that Simpson had any right, lawful authority, or Defendant's express consent to be on the tracks. Therefore, Defendant only owed Simpson a duty to refrain from willful or wanton conduct.

7

Accordingly, any claim based on Defendant's allegedly negligent conduct is barred under Pennsylvania's railroad civil immunity statute, and Defendant's Motion for Summary Judgment on this issue will be granted.

### B.    Defendant's Breach of Duty

Defendant also argues that Engineer Wilson did not act wantonly as a matter of law.  In Pennsylvania, "[w]anton misconduct . . . means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.  It usually is accompanied by a conscious indifference to the consequences."  Evans v. Phila. Transp. Co., 212 A.2d 440, 443 (internal quotation marks omitted) (quoting Prosser, Torts § 33 at 151 (2d ed. 1955)).

The Pennsylvania Supreme Court has distinguished wanton misconduct from willful misconduct by reasoning that willful misconduct requires that "the actor desires to bring about the result that followed, or at least that he was aware that it was substantially certain to ensue."  Id. Unlike willful misconduct, wanton misconduct does not require that a plaintiff establish actual prior knowledge of the injured person's peril.  See Evans, 212 A.2d at 443–44.  Instead, "if the actor realizes or at least has knowledge of sufficient facts to cause a reasonable man to realize the existing peril for a sufficient period of time beforehand to give him a reasonable opportunity to take means to avoid the accident, then he is guilty of wanton misconduct if [he] recklessly disregards the existing danger."  Id. at 444.  In other words, "wanton conduct may exist even if the actor is unaware of the trespasser's actual position of danger.  The crucial point in determining wantonness is whether or not the actor had sufficient warning of the possibility of the victim's peril."  Heller v. Consol. Rail Corp., 576 F. Supp. 6, 10 (E.D. Pa. 1982).  As this principle relates

to the motion before me, a train engineer's duty to attempt to avoid a collision or, in other words, refrain from wanton or willful conduct, arises when the injured person is in a "position of peril." Lopez v. CSX Transportation, Inc., 269 F. Supp. 3d 668, 675 (E.D. Pa. 2017) (citing Moss v. Reading Co., 212 A.2d 226, 228 (Pa. 1965)).

Importantly, the question of whether the defendant acted wantonly is typically a question of fact for the jury. Manfred, 106 F. Supp. 3d at 685; see also Evans, 212 A.2d at 442, 443. However, courts have, on occasion, decided this issue as a matter of law. See Manfred, 106 F. Supp. 3d at 685 (collecting cases).

The parties do not dispute this duty or that Simpson was, at some point, in a position of peril, which triggered Engineer Wilson's duty to attempt to avoid a collision. The parties' primary dispute focuses on *when* Simpson was, in fact, in a position of peril. Defendant argues that Simpson was not in a position of peril until it became apparent that he was unable to extricate himself in time to avoid the collision, presumably when Simpson crossed in front of the train about two seconds before impact and was unable to escape due to the trestle guardrail. Defendant contends that Engineer Wilson acted properly in attempting to avoid the collision, even before it became fully apparent that Simpson was in a position of peril and that I can therefore conclude, as a matter of law, that he owed no duty to Simpson until this moment. Plaintiff responds that Simpson was "clearly" in a position of peril well before this time, primarily because he was on the same track as the approaching train, "which triggered a duty to at least not accelerate the train towards a person on the tracks, as well as apply braking earlier, and more urgently, i.e. emergency brakes."  (Pl.'s Opp. at 15.)

The Pennsylvania Supreme Court has not established a clear test for "position of peril."  In Moss v. Reading Co., Pennsylvania's leading case regarding the duties owed to pedestrians at train

crossings, the Court affirmed the trial court's entry of a nonsuit at the close of the plaintiff's case based on its determination that the train engineer was "not guilty" of willful or wanton misconduct as a matter of law.  212 A.2d 226 at 228.  When the engineer in <u>Moss</u> first saw the decedent, the decedent was two tracks away, walking toward the track on which the train was traveling.  <u>Id.</u>  At that moment, the engineer was applying the brakes as he ordinarily did prior to coming to a station stop.  <u>Id.</u>  The plaintiff/appellant in <u>Moss</u> argued that the engineer should have realized at an earlier point that the decedent was in a position of peril and applied the emergency brake sooner.  <u>Id.</u>

The question before the Pennsylvania Supreme Court was "whether, at any time prior to stepping from the center track, decedent could be found to have been in a position of peril which the engineman should have recognized and whether, by merely sounding warning blasts from the train's whistle, the engineman manifested a reckless disregard of the existing danger and peril." <u>Id.</u>  The Court concluded that the decedent was not in a position of peril until he stepped from the center track, which was the next closest track to the approaching train's track, because "the engineman had every right to believe that a man, walking diagonally across the tracks toward an oncoming train with its headlight full beam and emitting warning whistle blasts, would stop at the center track, letting the train pass, rather than walk directly into its line of travel."  <u>Id.</u> "Although the engineman testified that decedent made no apparent reaction to his warning whistles, that fact [was] not sufficient to have given the engineman reason to believe that the warnings would have no effect on decedent's conduct and that decedent would place himself in a position of peril."  <u>See</u> <u>Moss</u>, 212 A.2d at 228–9.  The Court, therefore, determined that the decedent was not in a position of peril until he stepped off the center track heading for the track on which the defendant's train was traveling and that it was not wanton conduct to have failed to apply the brake sooner.  <u>Id.</u> at 229.

Here, Defendant presses that, as a matter of law, Simpson was not in a position of peril until after Engineer Wilson applied the service brake.  Defendant primarily relies on three district court cases to support this argument, each of which are factually distinguishable from the case before me.[46]

Defendant first cites to Sturdevant v. Erie Lackawanna Railroad Co., 319 F. Supp. 732 (W.D. Pa. 1970), for the proposition that Simpson was not in a position of peril until he was "unable to extricate himself" from the track in time to avoid the collision.  (Def.'s Mot. at 12 ("In Pennsylvania, the duty to attempt to stop or slow the train only arises when a person is in 'a position of peril,' which is not until it becomes apparent that the person 'is unable to extricate himself . . . in time to avoid the collision.'" (citing Sturdevant, 319 F. Supp. at 737.).)  In applying that standard, Defendant argues that Simpson was not in peril until he ran in front of the train in an attempt to cross the track.  (Id. at 14.)

Defendant mischaracterizes Sturdevant.  In that case, the question of the defendant railroad's wanton or willful conduct went to a jury, and the jury returned a verdict for the defendant.  Id. at 734.  The plaintiff then moved for a new trial, which the district court denied. Id.  The decedent in Sturdevant was not a pedestrian; he was driving an automobile, which was struck by the defendant's train while traversing a crossing.  Id. at 733–34.  The decedent had not stopped his automobile at the crossing, despite warning signs and familiarity with the crossing at that location.  Id.

In denying the plaintiff's motion for a new trial, the district court reasoned that the cases that had applied the position of peril rule up to that point were those "where an engineer or motorman ha[d] actually seen a vehicle at a position so near or upon the tracks as to become aware either that the driver has not seen the approach of the train, *or* is unable to extricate himself from

the crossing in time to avoid the collision." <u>Id.</u> at 736 (emphasis added) ("[W]e made an extensive examination of the cases allowing a wanton and willful charge and found in each of them an actual position of peril obvious to the engineer and motorman which required him to take some action to attempt to avoid a collision.").

Contrary to Defendant's characterization of the case, <u>Sturdevant</u> indicates that a person could be in peril when the train engineer has seen him in a position so near to or on the tracks as to be aware that the person has not seen the approach of the train.  This reasoning suggests that, contrary to Defendant's contention, Simpson could have been in a position of peril ***before*** he crossed in front of the train and was trapped by the trestle guardrail.  That is, a jury could find that Engineer Wilson had enough information to have been aware, much earlier than just before impact, that Simpson had not seen the approach of the train.

Defendant also relies on <u>Marsh v. Norfolk Southern, Inc.,</u> in which the court granted summary judgment on Plaintiff's wantonness claim.  243 F. Supp. 3d 557, 559 (M.D. Pa. 2017).  In <u>Marsh</u>, the train was traveling early in the morning, and, as it was going around two sets of curves, the crew noticed "something" near the tracks.  <u>Id.</u> at 560.  A conductor trainee had previously notified the train engineer that there was foot traffic up ahead on the track.  <u>Id.</u> at 564.  After noticing something near the track, the engineer began to blow the horn, and did so for approximately 16 seconds.  <u>Id.</u> at 560, 559-565.  At some point during those 16 seconds, the crew realized there was a pedestrian walking along the tie butts (outside the rails).  <u>Id.</u> at 565.  The engineer then stopped blowing the horn and engaged the emergency brake.  <u>Id.</u> at 560.  There was evidence that the engineer had applied the service brake at least 4 seconds before the emergency brake was engaged.  <u>Id.</u>  Before the engineer applied the brakes, the train's speed did not exceed 40 miles per hour.  <u>Id.</u>

The district court in <u>Marsh</u> determined that the record did not support that the engineer should have realized at an earlier point that the pedestrian was in a position of peril and, at that time, should have applied the emergency brake.  <u>Id.</u> at 565.  The court reasoned that there was no obligation to apply the emergency brake upon the first sight of the decedent because the crew did not know it was a person at that time.  The court explained that, according to Plaintiff's expert, even if the engineer had applied the emergency brakes when he first began to blow the horn, the train would not have stopped in time to prevent the accident and the decedent still would have been struck in the head at a speed of 7 to 10 miles per hour because the decedent never noticed the train approaching.  <u>Id.</u>

Several key facts in the case before me differ from <u>Marsh</u>.  First, the <u>Marsh</u> court reasoned that the engineer was under no obligation to apply the emergency brake at the first sight of decedent because the engineer did not know that it was a person on the track when he first blew the horn.  Here, Engineer Wilson testified that he blew the horn because he saw Simpson walking on the track with his back to the train.  Additionally here, unlike <u>Marsh</u>, the train speed increased from 61 miles per hour to 67 miles per hour before Wilson even engaged the service brake.  The engineer in <u>Marsh</u> also engaged the service brake first and then applied the emergency brake.  Engineer Wilson applied only the service brake and could not offer an explanation as to why he never engaged the emergency brake.

Finally, the <u>Marsh</u> court's reasoning rested heavily on the plaintiff's expert's opinion that, even if the engineer had applied the emergency brake when he first began to blow the horn, the decedent would have still been struck by the train at 7 to 10 miles per hour.  Here, Plaintiff's expert Loumiet specifically concludes that if Wilson had applied the service brake even 3 seconds after he blew the horn, then Simpson, who was attempting to run from the approaching train, would

have had approximately 4 more seconds to get past the trestle's north guardrail, and the accident would not have occurred.  Plaintiff's expert further opines that, if Wilson had engaged the emergency brake 3 seconds after the horn was blown, then Simpson would have had an additional 7 seconds to avoid the collision and the accident would not have occurred.  These facts, accepted as true, significantly differ from those in Marsh.

In Manfred v. National Railroad Passenger Corp., the third case relied on by Defendant, the court granted summary judgment in favor of the railroad on the issue of the train engineer's wantonness.  106 F. Supp. 3d 678 (W.D. Pa. 2015).  In Manfred, like Marsh, the engineer saw "something" on the track that he could not initially identify.  Id. at 680, 686.  The engineer stated that after a second or two in the dim light before sunrise he identified that a person was walking with his back to the train in the gauge of the track (i.e., in between the rails).  Id. at 680.  At some point after identifying a person on the track, the engineer blew the train's horn.  Id.  The engineer sounded the horn for 9.1 seconds.  Id. at 680.  Four to five seconds into sounding the horn, the engineer engaged the emergency brakes.  Id.  The train's speed never exceeded the speed limit of 60 miles per hour.  Id.  Relying only on the Pennsylvania Supreme Court's decision in Moss, the court concluded that the defendant did not, as a matter of law, engage in wanton conduct for failing to slow or stop the train.  Id. at 686.

Manfred is also factually distinguishable from the evidence before me.  In Manfred, the lighting was "dim" at the time of the incident and the engineer stated that he could not initially identify a person on the track.  Here, the incident occurred in the late afternoon, and Engineer Wilson was able to identify a person, Simpson, walking on the track with his back to the train. The engineer in Manfred also engaged the emergency brake a few seconds into blowing the horn; yet, Engineer Wilson blew the horn for 11.3 seconds before applying the service brake and never

14

engaged the emergency brake.  Finally, unlike Manfred, for 6.6 of the 11.3 seconds before Wilson

applied the service brake, the train increased speed from 61 miles per hour to 67 miles per hour.

Viewing the facts in the light most favorable to Plaintiff, as I must, I find that this case is

factually distinguishable from Sturdevant, Marsh, and Manfred.  A review of the following facts

suggests that a reasonable jury could conclude that Engineer Wilson had sufficient warning of the

possibility of Simpson's peril before he applied the service brake and, therefore, acted wantonly

by accelerating the train after seeing Simpson on the tracks and failing to engage the emergency

brake:

- Plaintiff's expert, Loumiet, opines that the line of sight from the point of impact to the engineer's cabin was 4,200 feet, which would have made Simpson visible to the engineer approximately 45.4 seconds prior to impact (compare Marsh, where it was not readily apparent that a person was on the tracks and Manfred, where the lighting was "dim").

- Engineer Wilson did not see Simpson or apply his horn until the train was 1,312 feet or 13.6 seconds before impact.[47]

- Wilson testified that he applied the horn because he saw decedent walking on the tracks with his back to the train.[48]  The video of the incident confirms that Simpson was walking away from the train on the south side of the same track as the train, outside of the rails.

- At the time the horn was applied, the train's speed was 61 miles per hour.  Plaintiff claims that Wilson continuously blew the horn for 11.3 seconds without any reaction from Simpson.

- The event recorder indicates that, approximately 1 to 2 seconds after the horn was blown, between 16:33:16 and 16:33:17, the throttle was decreased from T8 to T6, but then increased to T7 one second later, at 16:33:18.  Plaintiff claims that Wilson intentionally increased the throttle, and the parties agree that the throttle adjustments were manually made by Wilson.  The throttle was then moved to "I" or "idle" a couple of seconds later, at 16:33:20, and remained at idle until impact.

- The train's speed steadily increased from 61 miles per hour, at the time the horn was blown, until 67 miles per hour at 16:33:22, approximately 6.6 seconds before impact.[49]

15

- Engineer Wilson applied the service brake starting at 16:33:24 to 16:33:25, approximately 3.6 to 4.6 seconds before the train struck Simpson, but never applied the emergency brake.  When asked at his deposition why he applied the service brake and not the emergency brake, Wilson stated that he did not know.

- Plaintiff's expert Loumiet opines that 2.3 seconds before impact, Simpson reacted to the horn and began running away from the train.  But, at this point, Simpson was trapped by the trestle's guardrail and did not have enough time to get past the guardrail and out of the way before he was hit.

- The train was traveling 64 to 65 miles per hour when it struck and killed Simpson.

- Loumiet concludes that, if Wilson had applied the service brakes sooner—that is, 3 seconds after he sounded the horn—it would have taken the train an additional 4.6 seconds to reach the point of impact and impact would not have occurred.  Loumiet also concludes that had Wilson applied the emergency brakes 3 seconds after he first sounded the horn, it would have taken the train an additional 7 seconds to reach the point of impact, and the impact would never have occurred.

Based on all of the above facts, a reasonable jury could determine that Defendant acted wantonly by failing to see Simpson sooner, failing to sound the horn sooner, accelerating the train's speed after finally seeing Simpson walking on the tracks with his back to the train, not applying the service brake sooner, and failing to apply the emergency brake.  While Simpson's conduct certainly helped to create this dangerous situation, a jury could find that Engineer Wilson should have seen Simpson sooner, giving him "a reasonable opportunity to take means to avoid the accident."  Evans, 212 A.2d at 444.  Therefore, Defendant's motion for summary judgment regarding Plaintiff's wantonness claim will be denied.

## C.    Federal Preemption of Plaintiff's Excessive Speed Claims

Defendant also argues that any claims for excessive speed are preempted by the FRSA. Plaintiff responds that her excessive speed claim is not preempted because (1) Defendant violated its own rule, the Amtrak Slow Order, and (2) Defendant is a government actor so its internal policies create a federal standard of care.

16

In <u>CSX Transp., Inc. v. Easterwood</u>, the United States Supreme Court held that the FRSA's express preemption clause preempts common law tort claims regarding excessive speed claims. 507 U.S. 658, 675 (1993).  The Court explained that 49 C.F.R. § 213.9, which dictates the maximum train speeds for different classes of track, covers the subject matter of train speed.  <u>Id.</u> In concert with the FRSA's express preemption clause, which requires that "laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable," the Court held that § 213.9 preempted the plaintiff's common law negligence claims for excessive speed.  <u>Id.</u> at 662 n.2, 675.

In 2007, however, Congress amended the FRSA's preemption clause, placing limits on its preemptive effects.  <u>See</u> 49 U.S.C. § 20106 (2018).  The statute reads in relevant part:

> (b) Clarification regarding State law causes of action.--(1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party—
>
>> (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;
>> (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or
>> (C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

<u>Id.</u>

Pursuant to this Amendment, the Third Circuit outlined a two-step process for determining whether the FRSA preempts a state law.  <u>See</u> <u>Zimmerman v. Norfolk Southern Corp.</u>, 706 F.3d 170, 178 (3d Cir. 2013).  First, I must determine "whether the defendant allegedly violated either a federal standard of care or an internal rule that was created pursuant to a federal regulation.  If

so, the plaintiff's claim avoids preemption." Id.  If not, I "ask whether any federal regulation covers the plaintiff's claim." Id.

      1.       The Amtrak Slow Order was not created pursuant to a regulation

Preemption is avoided where a party "failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either [the Secretary of Transportation or the Secretary of Homeland Security.]"  49 U.S.C. § 20106(b)(1)(B).  Plaintiff acknowledges that she cannot identify a regulation or order issued by the Secretary of Transportation or the Secretary of Homeland Security on which the Amtrak Slow Order is based.  (Oral Argument Tr. 19:12–22.)

Courts have found that § 20106(b)(1)(B) did not apply to avoid preemption where plaintiffs could not identify a regulation or order pursuant to which an internal policy was made.  See Murrell v. Union Pacific R.R. Co., 544 F. Supp. 2d 1138, 1150 (D. Or. 2008); Johns v. CSX Transp., Inc., 210 F. Supp. 3d 1357, 1374 (M.D. Ga. 2016); Rawls v. Union Pacific R.R., No. 09-1037, 2011 WL 2784427, at *5 (W.D. Ark. Feb. 22, 2011).  Because Plaintiff admits that she cannot identify on what specific regulation the Amtrak Slow Order is based, I find that Plaintiff's excessive speed claim does not avoid preemption under § 20106(b)(1)(B).

      2.       The Amtrak Slow Order did not create a federal standard of care

Preemption may also be avoided if the party "has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters) . . . ."  49 U.S.C. § 20106(b)(1)(A).  A federal regulation creates a standard of care for FRSA preemption purposes "if it establishes the degree of care that the defendant—in most cases, the railroad—must exercise." Zimmerman, 706 F.3d at 179.

Plaintiff argues that the Amtrak Slow Order should hold the same weight as a federal regulation, rule, or standard created at the direction of the Secretary of Transportation because, (1)

in <u>Department of Transportation v. Association of American Railroads</u>, 575 U.S. 43, 55 (2015), the Supreme Court deemed Defendant a government actor with regulatory authority; and (2) "[t]he Secretary of Transportation holds all of Defendant's preferred stock and most of its common stock" and is also on Defendant's Board of Directors.

Plaintiff's argument fails for two reasons.   First, <u>Department of Transportation</u> is distinguishable from Plaintiff's case.  In that case, Congress passed a statute that gave the FRA and Defendant joint authority to create "metrics and standards" to address the performance and scheduling of passenger railroad services.  <u>Id.</u> at 47.  The plaintiffs argued that Congress could not delegate such regulatory authority to Defendant because it was a private entity.  <u>Id.</u> at 49–50.  The Court looked to the government's significant control over Defendant and decided that it was a governmental entity for purposes of the statute and, therefore, Congress could delegate such regulatory authority to Defendant.  <u>Id.</u> at 51–55.

Unlike in <u>Department of Transportation</u>, Defendant neither created the Amtrak Slow Order pursuant to a Congressional statute nor acted jointly with the FRA in creating the Amtrak Slow Order.  Although Plaintiff argues that Defendant, acting solely by its own authority, created a federal standard of care, Congress did not give Defendant the authority to displace § 213.9's speed restrictions.  Further, in <u>Department of Transportation</u>, the Court did not provide Defendant with the authority to unilaterally bind the FRA and other railroads to Defendant's internal policies. <u>Department of Transportation</u> held only that Congress ***could*** legislate to give Defendant greater regulatory authority.  <u>Id.</u> at 53–54.

Second, even if Amtrak were a government actor, § 20106(b)(1)(A) allows a party to avoid preemption only where a defendant has failed to comply with a federal standard of care created "by a regulation or order ***issued by the Secretary of Transportation***."  49 U.S.C. § 20106(b)(1)(A)

(emphasis added).  Defendant's actions do not qualify as regulations or orders issued by the Secretary of Transportation simply because the Secretary of Transportation is a member of Defendant's Board of Directors and holds all of Defendant's preferred stock and most of its common stock.  For the Secretary of Transportation to issue an effective rule or order regarding railroad safety, the Secretary must go through the notice and comment rulemaking process.  See 49 U.S.C. § 20116(2).  There is no evidence that the Amtrak Slow Order was subject to this process.  Further, the Secretary has explicitly delegated authority to the FRA to "[c]arry out the functions and exercise the authority vested in the Secretary by 49 U.S.C. Subtitle V, Part A (Safety, chapter 201 et seq.) . . . ."  49 C.F.R. § 1.89 (2016).  The Secretary has delegated no such authority to Defendant.  Thus, I find that the Amtrak Slow Order does not create a federal standard of care.

Because Plaintiff cannot avoid preemption under § 20106(b)(1)(A) of § 20106(b)(1)(B), I must then determine whether a federal regulation covers Plaintiff's claims.  Because I conclude that 49 C.F.R. § 213.9 covers the claims in the Complaint based on the allegedly excessive speed of Defendant's train, such claims are preempted by the FRSA.

### D.   Comparative Negligence and Decedent's Wantonness

Defendant next argues that Plaintiff is barred from recovery because of Simpson's own negligence and wantonness.  Pennsylvania's comparative negligence statute provides that "the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than" the defendant's. 42 Pa. Cons. Stat. § 7102(a).  Instead, "any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff."  Id.

There is no equivalent statute for "comparative wantonness" in Pennsylvania.  See Lewis v. Miller, 543 A.2d 590, 592–93 (Pa. Super. Ct. 1988).  Thus, a plaintiff who acts wantonly is

barred from recovery.  Id.; see also Hansen v. Peco Energy Co., No. 98-1555, 1999 WL 681481, at *4–5 (E.D. Pa. Aug. 25, 1999); Vargus v. Pitman Mfg. Co., 510 F. Supp. 116, 118–119 (E.D. Pa. 1981).

When a defendant's conduct is considered willful or wanton, the plaintiff's comparative negligence is irrelevant and will not be used to deduct from awarded damages.  See, e.g., Krivijanski v. Union R.R. Co., 515 A.2d 933, 936 (Pa. Super. Ct. 1986); see also Duchesneau v. Cornell University, No. 08-4856, 2011 WL 5902216, at *4 (E.D. Pa. Nov. 23, 2011); Lewis v. Miller, 543 A.2d 590, 591 (Pa. Super. Ct. 1988).

Here, because Defendant's wanton conduct is solely at issue, only Simpson's wantonness, not his comparative negligence, is relevant.  In Pennsylvania, however, "minors between the ages of seven and fourteen years are presumed incapable of negligence, but the presumption is a rebuttable one that weakens as the fourteenth year is approached."  Dunn v. Teti, 421 A.2d 782, 784 (Pa. Super. Ct. 1980) (citing Kuhns v. Brugger, 135 A.2d 395, 340 (Pa. 1957)).  Instead, "[a] child is held to that measure of care that other minors of like age, experience, capacity and development would ordinarily exercise under similar circumstances."  Id. (citing Kuhns, 135 A.2d at 340).  This presumption is meant to account for minors' lack of maturity, or a lack of the "attention, intelligence and judgment necessary to enable [them] to perceive risk and recognize its unreasonable character."  Id. at 783.

Thus, before I can reach the question of Simpson's wantonness, Defendant must first overcome the presumption that Simpson, a thirteen-year-old, was incapable of wanton conduct. Defendant argues that it has overcome this presumption because (1) Simpson was about five months shy of his fourteenth birthday; (2) Simpson had lived in Parkesburg for six months in close proximity to Defendant's "visibly and audibly active tracks," (3) his parents warned him to stay

away from the tracks, (4) Simpson verbally acknowledged their instructions, (4) he went to his after-school program almost every day and was familiar with safe alternative routes, (5) he knowingly entered onto a railroad's right-of-way on which trains regularly travel, and (6) he engaged in a 10 minute cell phone video chat while walking on the tracks.[50]

In response, Plaintiff explains that Simpson's father typically drove him to the after-school program, so he was not necessarily familiar with safe walking routes.[51]  Plaintiff also argues that, even though she admits that she and her husband gave Simpson general warnings about the track, neither she nor her husband specifically warned him not to walk along the tracks.[52]

While the facts cited by Defendant may be persuasive to a jury, I cannot determine as a matter of law that Simpson's actions were wanton or that he was even capable of wantonness at the age of 13.  The question of contributory fault in this case is clearly a question for the factfinder.

### E.   **Punitive Damages**

Finally, Defendant argues that punitive damages cannot be awarded in this case as a matter of law.  Defendant claims the record is devoid of facts showing that its actions rose to the level of culpability needed to permit an award of punitive damages in Pennsylvania.  In Pennsylvania, punitive damages are "an 'extreme remedy' available in only the most exceptional matters." Phillips v. Cricket Lighters, 883 A.2d 439, 445 (Pa. 2005) (quoting Martin v. Johns–Manville Corp., 494 A.2d 1088, 1098 n.14 (Pa. 1985), abrogated on other grounds by Kirkbride v. Lisbon Contractors, Inc., 555 A.2d 800 (Pa. 1989)).  They are only awarded "for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others."  Martin, 494 A.2d at 1097–98 (quoting Chambers v. Montgomery, 192 A.2d 355, 358 (1963)).  The purpose

of punitive damages is to punish the defendant and deter him and others from engaging in similar conduct.  Hutchinson ex rel. Hutchinson v. Luddy, 870 A.2d 766, 770 (Pa. 2005).

The Pennsylvania Supreme Court has stated that punitive damages may only be awarded "where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct."  Id.  Yet, the Court has also explained that wanton misconduct, in terms of a party's liability, is not equivalent to the "outrageous conduct . . . done with a reckless indifference to the interests of others" for the purpose of assessing punitive damages.  See Martin, 494 A.2d at 1097. "'We simply cannot say that the evidence was sufficient to demonstrate that subjective kind of awareness that is the distinguishing element of reckless conduct [for the purpose of awarding punitive damages].  It is quite clear from the evidence, that the jury could well have found negligence or even gross negligence on the part of this defendant.  But negligent conduct, no matter how gross or wanton, cannot be equated with the conduct required for punitive damages.'"  Id. at 1098 n. 13 (quoting Thomas v. American, 414 F. Supp. 255, 266–67 (E.D. Pa. 1976)).

While a reasonable jury could find that Engineer Wilson's failure to brake sooner, failure to engage the emergency brake, and acceleration of the train after seeing Simpson walking on the tracks with his back to the train is wanton conduct, the evidence in support of Plaintiff's case, as detailed above, is insufficient to show that Wilson's conduct was so outrageous as to demonstrate bad motive or a reckless indifference toward Simpson's safety.  Wilson did act to attempt to stop or slow the train even if the jury finds that he did not act when his duty was triggered.  This conduct, although potentially wanton, is insufficient as a matter of law to support a claim for punitive damages.  Thus, Defendant's motion for summary judgment on these grounds will be granted.

IV.     **DAUBERT MOTION**

Defendant seeks to exclude the testimony of Plaintiff's liability expert Richard Beall pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Because I do not rely on Mr. Beall's opinion in deciding the instant motion for summary judgment, I will deny Defendant's motion to preclude his testimony without prejudice.  This issue may be raised, if necessary, before trial.

V.      **CONCLUSION**

For the foregoing reasons, I will grant in part and deny in part Defendant's Motion for Summary Judgment, and I will deny without prejudice Defendant's motion to exclude Mr. Beall's testimony.

An appropriate Order follows.

---

[1]      Pursuant to my Policies and Procedures (Page 9), "[a]ny motion for summary judgment . . . shall include a short and concise Statement of Undisputed Facts as a separate exhibit. . . . The papers opposing a motion for summary judgment shall include as a separate exhibit a short and concise statement of the material facts, which respondent contends present genuine issues for trial.  This statement should respond to the numbered paragraphs set forth in the moving party's Statement of Undisputed Facts.  The responding party also shall set forth, in separate numbered paragraphs, any additional facts which the respondent contends preclude summary judgment.  The Court will accept all material facts set forth in the moving party's statement as admitted unless controverted by the opposing party."
        Here, Defendant did not respond to Plaintiff's Counterstatement of Undisputed Facts.  Therefore, to the extent there are material facts raised in Plaintiff's Counterstatement, they are deemed admitted.  In fact, I raised this issue with defense counsel at oral argument, and he acknowledged that Defendant did not respond to Plaintiff's Counterstatement of Undisputed Facts, stating that it had not done so because any statements that Defendant may have disputed were statements based on Plaintiff's expert's opinions.  (Oral Argument Tr. 5:9–18.)  Defendant agreed that the opinions of Plaintiff's experts would be considered undisputed for purposes of summary judgment.  (Id. at 5:20–25.)

[2] (Def.'s Undisp. Facts ¶ 2; Pl.'s Response ¶ 2.)

[3] (Def.'s Undisp. Facts ¶ 9; Pl.'s Response ¶ 9; Compl. ¶ 4; Ans. ¶ 4.)

[4] (Def.'s Undisp. Facts ¶ 3; Pl.'s Response ¶ 3.)

[5] (Def.'s Undisp. Facts ¶ 6; Pl.'s Response ¶ 6.)

[6] (Def.'s Undisp. Facts ¶ 8; Pl.'s Response ¶ 8.)

[7] (Pl.'s Response ¶ 8.)

[8] (Def.'s Undisp. Facts ¶ 4; Pl.'s Response ¶ 4; Pl.'s Opp., Ex. "1," 64:23–65:14; Pl.'s Opp., Ex. "2," 37:11–38:7.)

[9] (Def.'s Undisp. Facts ¶ 5; Pl.'s Response ¶ 5.)

[10] (Pl.'s Undisp. Facts ¶¶ 10–11.)

[11] (Def.'s Undisp. Facts ¶ 25; Pl.'s Response ¶ 25.)

[12] (Def.'s Undisp. Facts ¶ 21; Pl.'s Response ¶ 21.)

[13] (Def.'s Undisp. Facts ¶ 25; Pl.'s Response ¶ 25.)

[14] (Def.'s Undisp. Facts ¶ 22; Pl.'s Response ¶ 22.)

[15] (Pl.'s Undisp. Facts ¶ 14, Pl.'s Opp., Ex. "4," at 11.)

[16] (Pl.'s Undisp. Facts ¶ 13; Pl.'s Opp., Ex. "4," at 9.)

[17] (Def.'s Undisp. Facts ¶¶ 33, 35–37; Pl.'s Response ¶¶ 33, 35–37; Pl.'s Undisp. Facts ¶ 18.)

[18] (Def.'s Undisp. Facts ¶¶ 35–37; Pl.'s Response ¶¶ 35–37; Pl.'s Undisp. Facts ¶ 18; Pl.'s Opp., Ex. "6" (event recorder data showing that Wilson applied the horn at timestamp 16:33:15).)

[19] (Def.'s Undisp. Facts ¶¶ 31–32; Pl.'s Response ¶¶ 31–32.)

[20] (Pl.'s Opp., Ex "6" (event recorder data).)

[21] (Pl.'s Undisp. Facts ¶ 27.)

[22] (Def.'s Undisp. Facts ¶ 54; Pl.'s Response ¶ 54; Pl.'s Undisp. Facts ¶ 28; Pl.'s Opp., Ex. "6" (event recorder data showing that the train's speed when the horn was applied was 61 miles per hour and that the train's speed steadily increased until 67 miles per hour until 16:33:22).)

[23] (Def.'s Undisp. Facts ¶ 49; Pl.'s Response ¶ 49; Pl.'s Undisp. Facts ¶ 29; Pl.'s Opp., Ex. "6" (event recorder data showing that, approximately 1 to 2 seconds after the horn was blown, between 16:33:16 and 16:33:17, the throttle was decreased from T8 to T6).)

[24] (Def.'s Undisp. Facts ¶ 49; Pl.'s Response ¶ 49; Pl.'s Undisp. Facts ¶ 29; Pl.'s Opp., Ex. "6" (event recorder data showing that the throttle was increased to T7 at 16:33:18).)

[25] (Def.'s Undisp. Facts ¶ 51; Pl.'s Response ¶ 51.)

[26] (Compare Def.'s Undisp. Facts ¶ 49, with Pl.'s Response ¶ 49 and Pl.'s Undisp. Facts ¶ 29.)

[27] (Def.'s Undisp. Facts ¶ 50; Pl.'s Response ¶ 50.)

[28] (Def.'s Undisp. Facts ¶ 52; Pl.'s Response ¶ 52; Pl.'s Opp., Ex. "6" (event recorder data showing that the throttle was moved to "I" or idle at 16:33:20).)

[29] (Def.'s Undisp. Facts ¶ 52; Pl.'s Response ¶ 52.)

[30] (Def.'s Undisp. Facts ¶ 33; Pl.'s Response ¶¶ 17, 33; Pl.'s Undisp. Facts ¶ 12; Def.'s Mot., Ex. F, at 2:24 (video of incident); (Def.'s Mot., Ex. K, 61:18–20, 14:17–115:3).)

[31] (Pl.'s Undisp. Facts ¶ 26.)

[32] (Def.'s Undisp. Facts ¶ 13; Pl.'s Response ¶ 13.)

[33] (Def.'s Undisp. Facts ¶ 41; Pl.'s Response ¶ 41; Pl.'s Opp., Ex. "6" (event recorder data showing that Wilson began braking between 16:33:24 to 16:33:25).)

[34] (Pl.'s Undisp. Facts ¶ 31; Pl.'s Opp., Ex. "7," at 76:18–77:5.)

[35] (Def.'s Undisp. Facts ¶ 40; Pl.'s Response ¶ 40.)

[36] (Pl.'s Opp., Ex. "7," 118:20–119:6.)

[37]    Plaintiff's expert Loumiet concludes that Simpson did not react to the train's horn until 2.3 seconds before impact.  (Pl.'s Undisp. Facts ¶ 25.)  Defendant relies on Plaintiff's expert, Richard Beall, who states that Simpson ran across the track in front of the train about 12 seconds after Wilson applied the horn.  (Def.'s Undisp. Facts ¶ 55; Pl.'s Response ¶ 55.)

[38] (Def.'s Undisp. Facts ¶¶ 18, 20; Pl.'s Response ¶¶ 17, 18, 20; Def. Mot., Ex. F, at 2:26 to 2:27 (video of incident).)

[39] (Def.'s Undisp. Facts ¶ 17; Pl.'s Response ¶ 17; Def. Mot., Ex. F, at 2:25 to 2:26 (video of incident).)

[40] (Def.'s Undisp. Facts ¶¶ 15, 20; Pl.'s Response ¶¶ 15, 20; Def. Mot., Ex. F, at 2:26 to 2:27 (video of incident).)

[41] (Def.'s Undisp. Facts ¶ 58; Pl.'s Response ¶ 58; Pl.'s Undisp. Facts ¶ 32.)

[42] (Pl.'s Undisp. Facts ¶ 34.)

[43] (Id. at ¶ 35.)

[44]    Plaintiff concedes that any claim for Defendant's failure to train Engineer Wilson is federally preempted by the FRSA.  (Pl.'s Opp. at 2.)  Plaintiff has also agreed not to pursue a claim based on Defendant's failure to erect fencing along the right-of-way.  (Id.)  I will, therefore, grant Defendant's motion on these issues.

[45] (Compl. ¶ 4; Ans. ¶ 4; see also Def.'s Undisp. Facts ¶¶ 5, 9; Pl.'s Response ¶¶ 5, 9.)

[46]    I am also unpersuaded by Defendant's reliance on Kowaleski v. Pennsylvania Railroad Co., 103 F.2d 827 (3d Cir. 1939).  Kowaleski, decided some 80 years ago, concerned a matter of New Jersey law.  The question before me is governed by Pennsylvania law.

[47] (Pl.'s Opp., Ex. "6" (event recorder data showing that Wilson applied the horn at timestamp 16:33:15).)

[48] (Def.'s Mot., Ex. K, 61:18–20, 14:17–115:3.)

[49] (Def.'s Undisp. Facts ¶ 54; Pl.'s Response ¶ 54.)

[50] (Def. Mot. at 20.)

[51] (Pl.'s Undisp. Facts ¶¶ 6–8; Pl.'s Response ¶8; Pl. Opp. at 5–6.)

[52] (Pl.'s Response ¶ 4.)